IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

TIMOTHY THOMAS
     Petitioner,

vs.                             Case No. 4:07cv473/MMP/EMT

WALTER A. McNEIL,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

       This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1).  Respondent filed an answer and relevant portions of the state court record (Doc. 13).  Petitioner filed a reply (Doc. 19).

       The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.     BACKGROUND AND PROCEDURAL HISTORY

       The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 13, Exhibits).[1]  Petitioner was indicted in the Circuit Court for Leon County, Florida, for first degree murder (a capital felony) and armed robbery with a firearm (a first degree felony) (Ex. B at 19).  The defense filed a motion to preclude the State from seeking

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (Doc. 13).

the death penalty, and the State did not contest that it was prohibited as a matter of law from seeking the death penalty against Petitioner (*id.* at 218–24). The case proceeded to a jury trial (Ex. C). The court granted a judgment of acquittal on premeditated murder (Ex. C at 1004–06), and the case went to the jury on first degree felony murder and armed robbery with a firearm (*id.*). The jury found Petitioner guilty of manslaughter and armed robbery with a firearm (Ex. B at 270–71, Ex. C at 1200). On October 9, 2003, Petitioner was sentenced to life imprisonment on the armed robbery count and a concurrent term of fifteen (15) years of imprisonment on the manslaughter count, with pre-sentence jail credit of 1,294 days (Ex. B at 279–85; Ex. D). Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"). On March 14, 2005, the First DCA affirmed the judgment of conviction per curiam without written opinion (Ex. I). Thomas v. State, 895 So. 2d 1072 (Fla. 1st DCA 2005) (Table). Petitioner did not seek further review by the Florida Supreme Court or the United States Supreme Court.

On August 11, 2005, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, in the trial court (Ex. J at 1–32). The trial court denied the motion on September 7, 2005 (*id.* at 33–34). Petitioner appealed the decision to the First DCA. On February 16, 2006, the First DCA affirmed per curiam without written opinion, with the mandate issuing March 14, 2006 (Exs. K, L, M). Thomas v. State, 924 So. 2d 818 (Fla. 1st DCA 2006) (Table).

On March 30, 2006, Petitioner filed a petition for writ of habeas corpus in the First DCA, alleging ineffective assistance of appellate counsel (Ex. N). The First DCA denied the petition on the merits on May 23, 2006, and denied Petitioner's motion for rehearing on June 19, 2006 (Exs. O, P). Thomas v. State, 931 So. 2d 175 (Fla. 1st DCA 2006).

Also on March 30, 2006, Petitioner filed a second Rule 3.850 motion in the trial court (Ex. Q at 1–30). The trial court denied the motion on April 11, 2006 (*id.* at 40–46). Petitioner appealed the decision to the First DCA. On October 23, 2006, the First DCA affirmed per curiam without written opinion, with the mandate issuing December 29, 2006 (Exs. T, U). Thomas v. State, 944 So. 2d 356 (Fla. 1st DCA 2006) (Table).

On May 10, 2006, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure, in the trial court (Ex. V at 1–4). The trial court

denied the motion on April 12, 2006 (*id.* at 5). Petitioner appealed the decision to the First DCA. On October 4, 2006, the First DCA affirmed per curiam without written opinion, with the mandate issuing October 31, 2006 (Exs. W, X, Y). <u>Thomas v. State</u>, 939 So. 2d 1065 (Fla. 1st DCA 2006) (Table).

Petitioner filed the instant habeas action on September 4, 2007 (Doc. 1 at 30).[2] Respondent concedes that the petition is timely (Doc. 13 at 5).

## II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

---

[2] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v. Nagle</u>, 138 F.3d 917, 923 (11th Cir. 1998), <i>overruled on other grounds by</i> <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

---

[3] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion."  Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

A.    Ground One: "Deprivation of Rights as Secured by the Fifth and Fourteenth Amendments to the United States Constitution Through the Failure to Grant Motion to Suppress Statements."

In Ground One, Petitioner contends the trial court erred in denying defense counsel's motion to suppress oral statements made by Petitioner to law enforcement on March 24, 2000, after his arrest (Doc. 1 at 6, 7–9). He contends the statements were subject to suppression because Detective Kenny Pinkard, the arresting officer, did not have probable cause to arrest him (*id.*).

Respondent contends Petitioner's claim is barred by <u>Stone v. Powell</u>, 428 U.S. 465 (1976) (Doc. 13 at 9–10). Respondent states Petitioner's trial counsel filed a motion to suppress the statements to law enforcement on the ground that Petitioner was arrested without probable cause, and the statements were the fruit of this unlawful arrest (*id.* at 9). Respondent contends the trial court held an evidentiary hearing where witnesses were called and testified, and Petitioner appealed the trial court's denial of the motion to suppress to the First DCA (*id.* at 9–10). Therefore, Petitioner had a full and fair opportunity to litigate the Fourth Amendment issue in state court (*id.* at 10).

In Petitioner's reply, he argues he did not have a full and fair opportunity to litigate the Fourth Amendment issue because all of the witnesses who testified at the evidentiary hearing were "State witnesses," who testified against him (Doc. 19 at 2–3). Petitioner states he was not given the opportunity to present testimony or physical evidence to support his position (*id.* at 3). Additionally, Petitioner argues, for the first time, that his arrest was unlawful because the probable cause affidavit signed by Detective Pinkard was sworn to by Detective Steven Harrelson but did not bear a notary seal (*id.* at 3; *see* Doc. 13, Ex. B at 1–6). Petitioner contends defense counsel provided ineffective assistance by failing to include this as an additional ground for suppression of his statements to law enforcement (*id.* at 3–4).

Upon review of the record, the undersigned concludes that Petitioner's Fourth Amendment claim—grounded upon his arrest without probable cause—was given a full and fair hearing in the state courts. Petitioner's counsel initially raised the claim in the trial court in a motion to suppress (Ex. B at 34–51), and an evidentiary hearing was held at which Petitioner's counsel presented testimony from three witnesses and the prosecutor presented testimony from one witness (*id.* at 65–162). Petitioner appealed the trial court's denial of the motion to suppress to the First DCA (Ex. G). As a result, under the clear language of <u>Stone v. Powell</u>, this court lacks authority to review his Fourth Amendment claim based upon the lack of probable cause to support his arrest. *See* <u>Devier v. Zant</u>, 3 F.3d 1445, 1455 (11th Cir. 1993) (federal habeas court lacked authority to review claims

by capital murder defendant that his rights under Fourth Amendment were violated because he was arrested under authority of a warrant not supported by probable cause and that certain of his statements admitted at trial were the fruits of this allegedly improper arrest; his claims were given full and fair hearing in state courts, as they were raised initially to trial court in motion to suppress and appeal was taken to state supreme court from denial of that motion); Harris v. Dugger, 874 F.2d 756, 761 (11th Cir. 1989).

With regard to Petitioner's Fourth Amendment claim based upon the lack of a notary seal on the probable cause affidavit, Petitioner did not assert this claim in his federal petition, rather, he asserted it for the first time in his reply brief. Therefore, he did not properly raise a Fourth Amendment claim based upon the lack of the notary seal. Furthermore, Petitioner could not amend his petition "as a matter of course" by including this additional claim in his reply because Respondent had already served its answer. *See* Fed. R . Civ. P. 15(a) (a party is permitted to amend a pleading once "as a matter of course" at any time before a responsive pleading is served or, otherwise, only by leave of court or by written consent of the adverse party); Rule 11 of the Rules Governing Section 2254 Proceedings (district court may apply the Federal Rules of Civil Procedure consistent with the Rules Governing Section 2254 Proceedings). Moreover, Petitioner did not seek leave of court to amend his petition, and the undersigned does not construe Petitioner's reply as such a request because Petitioner expressly stated his intent that the document be deemed a reply to Respondent's answer, and nowhere in the document does Petitioner mention a desire or intent to amend his petition or add a new claim (*see* Doc. 19). Therefore, this additional Fourth Amendment claim is not properly before this court. *See* Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (traverse is not proper pleading to raise additional grounds for relief; in order for state to be properly advised of additional claims, they should be raised in amended petition or statement of additional claim); *see also,* Klauer v. McNeil, No. 3:07cv541/LAC/EMT, 2009 WL 2399928, at *30 (N.D. Fla. July 31, 2009); Cleckler v. McNeil, No. 3:07cv283/MCR/EMT, 2009 WL 700828, at *11 n.4 (N.D. Fla. Mar. 16, 2009). Although some courts have recognized an exception to this rule of refusing to consider claims that are not properly presented if "the issue has been briefed fully on the merits [so that] the government will not be prejudiced if [the court] consider[s] it," *see* United States v. Allen, 157 F.3d 661, 667 (9th Cir. 1998) (citation omitted), here, Respondent did not brief the

issue of Petitioner's additional Fourth Amendment claim.  Therefore, the improperly brought claim will not considered.

B.    Ground Two:  "Deprivation of Rights as Secured by the Sixth and Fourteenth Amendments to the United States Constitution Through Ineffective Assistance of Trial Counsel, and Through Procedural Due Process."

Petitioner contends his trial counsel provided ineffective assistance by failing to object to admission of an audiotape of a conversation between him and a confidential informant on the ground that it was partially inaudible (Doc. 1 at 6, 10–12).  He additionally contends counsel should have objected to Detective Pinkard's testimony interpreting the audiotape, on the ground that the testimony was inadmissible hearsay (*id.*).  Petitioner contends trial counsel's failure to object to admission of the audiotape waived his right to challenge its admission on direct appeal, and such a challenge would have been successful (*id.* at 10).  He further argues that if counsel had objected to admission of Detective Pinkard's testimony interpreting the audiotape, Petitioner could have successfully challenged admission of the testimony on appeal (*id.* at 10–11).

Petitioner contends he raised this claim as Ground One in his second Rule 3.850 motion, but the trial court denied his claim without holding an evidentiary hearing and denied his motion for rehearing (*id.* at 10, 11–12).  He states the appellate court affirmed without a written opinion (*id.*).

Respondent concedes Petitioner exhausted this claim of ineffective assistance of counsel (Doc. 13 at 10).

To the extent Petitioner asserts a procedural due process claim based upon the post-conviction court's denial of his claim without an evidentiary hearing and the appellate court's affirming the decision without written opinion, he is not entitled to relief.   It is well established in the Eleventh Circuit that a § 2254 court is not an appropriate forum for a prisoner who wishes to challenge the process afforded him in state collateral proceedings.  This is so, because such a claim represents an attack on a proceeding collateral to the prisoner's confinement and not the confinement itself.  *See* Anderson v. Secretary for Dep't of Corr., 462 F.3d 1319, 1330 (11th Cir. 2006) (affirming district court's denial of habeas relief based on claim that state court failed to hold evidentiary hearing on Rule 3.850 motion); Spradley v. Dugger, 825 F.2d 1566, 1568 (11th  Cir. 1987) (per curiam) (concluding § 2254 claim that petitioner's due process rights were violated when

state post-conviction court held no evidentiary hearing and failed to attach appropriate portions of record to its opinion "goes to issues unrelated to the cause of petitioner's detention [and] does not state a basis for habeas relief").

In the instant case, the state collateral proceeding where this alleged procedural due process violation occurred was not part of the direct review process of Petitioner's conviction, rather, Petitioner's direct appeal to the First DCA in Thomas v. State, 895 So. 2d 1072 (Fla. 1st DCA 2005) was the direct review proceeding. Therefore, Petitioner's procedural due process challenges to the process afforded him in the state collateral review proceeding, which Petitioner asserts with each ground for relief in his federal habeas petition, do not provide a basis for federal habeas relief. The court will thus review only Petitioner's ineffective assistance of counsel claims set forth in Grounds Two, Three, Four, Six, and Seven, and Petitioner's due process claim, based upon an alleged error that occurred at trial, set forth in Ground Five.

1.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. Id. at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly

deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

Moreover,

> Trying cases is no exact science. And as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that calls for great precision or for a categorical approach. When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate." Atkins v. Singletary, 965 F. 2d 952, 958 (11th Cir. 1992). And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy." Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1993). Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it can be shown that no reasonable lawyer, in the circumstances, would have done so.

Rogers v. Zant, 13 F. 3d 384, 386 (11th Cir. 1994); *see also* Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (to show counsel's performance was unreasonable, defendant must establish that no competent counsel would have taken the action that his counsel did take); Chandler, 218 F.3d at 1313 (issue is not what is possible, prudent, or appropriate, but what is constitutionally compelled) (citing Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)).

As stated by the Eleventh Circuit:

> No absolute rules dictate what is reasonable performance for lawyers. [citing Strickland, 104 S.Ct. at 2065; other citations omitted]. "Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Strickland, 104 S.Ct. at 2065; [other citations omitted]. The law must allow for bold and for innovative approaches by trial lawyers. And, the Sixth Amendment is not meant "to improve

the quality of legal representation," but "simply to ensure that criminal defendants receive a fair trial." Strickland, 104 S.Ct. at 2065.

Chandler, 218 F.3d at 1307. However, not every strategic decision passes constitutional muster. Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. See 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, Hardwick 320 F.3d at 1163; Jackson, 42 F.3d at 1367; Horton, 941 F.2d at 1462. In determining whether counsel's decision was reasonable, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–406.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether

there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2. Federal Review of State Court Decision

Petitioner raised this claim of ineffective assistance of counsel as Ground One in his second Rule 3.850 motion (Ex. Q at 8–12). In the state court's written opinion denying the motion, the court found as fact that the subject of the audiotape was a conversation after the murder between Petitioner and a confidential informant ("CI"), overheard by Special Agent Pinkard via wireless intercept as the conversation was taking place (*id.* at 40). The court found that Petitioner was originally charged with capital first degree murder and armed robbery with a firearm (*id.* at 41). During cross-examination of Special Agent Pinkard, defense counsel used the audiotape to establish that Petitioner said he would not take anyone's life, thus permitting the defense to admit essential testimony regarding intent as to the murder charge without having to introduce evidence in the defense's case (*id.*). The court found that this evidence supported the court's judgment of acquittal on the theory of premeditated murder, and it supported the jury's lesser verdict of manslaughter by culpable negligence, punishable by only fifteen years, compared to the main charge of felony murder, punishable by mandatory life imprisonment without parole (*id.*). The court further found that if defense counsel had introduced the tape or called Pinkard as a witness to establish Petitioner's critical exculpatory statement, the defense would have lost opening and closing final argument (*id.*). The court noted that the prosecutor was locally well-known for devastating the defense when he had the last word on final argument (*id.* at 41–42). The court further found that by permitting introduction of the audiotape, defense counsel preserved the tactical advantage of not requiring Petitioner to testify (*id.* at 42).

The state court additionally found that in another recorded police interrogation (separate from the recorded conversation between Petitioner and the CI), Petitioner confessed to the armed robbery (as a principal), as well as to facts that supported a conviction for felony murder (Ex. Q at 42). The court found that Petitioner's cousin, Ulysses Thomas, a co-defendant, testified to facts establishing that Petitioner was guilty of both felony murder and armed robbery (*id.*). Ulysses Thomas testified that Petitioner took the victim's watch (*id.*). Mr. Brinson, Petitioner's distant cousin, testified that Petitioner gave him the victim's watch (*id.*). The watch was positively

identified at trial as belonging to the victim (*id.*).  The court determined that although the audiotape of the conversation between Petitioner and the CI incriminated Petitioner in the robbery, the armed robbery was established (based upon a principal theory) by overwhelming evidence unrelated to the CI tape (*id.* at 40, 42).  As to the murder charge, the court determined that the CI tape actually aided Petitioner because it tended to corroborate Ulysses Thomas' testimony that he and Petitioner affirmatively tried to dissuade the shooter (Brawner) from shooting the victim (*id.* at 42).  Furthermore, the CI tape allowed the jury to hear Petitioner's exculpatory statements to a CI while unaware of police surveillance, a point which defense counsel argued during closing argument (*id.*).  The court opined that the CI tape obviously convinced the jury that Petitioner lacked any murderous intent (*id.* at 40–42).  The court concluded that Petitioner was not prejudiced by admission of the CI tape because there was "no reasonable possibility" that the verdict was adversely affected by the audiotape or Detective Pinkard's testimony regarding the recording (*id.* at 40, 42).  Therefore, the court denied Petitioner's ineffective assistance of counsel claim on the merits (*id.* at 43).

The state court did not cite a state or federal case for the legal standard governing Petitioner's ineffective assistance of counsel claims, but it is clear from the language of the written decision that the standard applied by the court with regard to Petitioner's claims was whether Petitioner demonstrated that his counsel performed deficiently, and whether the deficiency had any adverse effect on the outcome of the trial (Ex. Q at 40–46).  This rule is not inconsistent with the Strickland standard; rather, it is consistent with that precedent.[4]  *See* Early, 537 U.S. at 8 (a state court need not cite Supreme Court precedent (or even be aware of it) if the decision is consistent with the precedent); Parker v. Sec'y of Dep't of Corr., 331 F.3d 764, 775–76 (11th Cir. 2003) (same).  Furthermore, the state court did not arrive at a result different from Supreme Court precedent on facts materially indistinguishable from a decision of the Supreme Court.  Therefore, Petitioner has failed to show that the state court decision was contrary to Strickland.

Additionally, Petitioner has failed to present clear and convincing evidence rebutting the state court's factual findings and has thus failed to show that the state court's decision was based

---

[4] By stating that there was no reasonable possibility that the verdict was affected by the CI tape or Pinkard's testimony regarding it, the state court inherently determined that there was no reasonable probability of a different outcome.

upon an unreasonable determination of the facts. Therefore, Petitioner's only means of obtaining relief on this claim is to demonstrate that the state court's denial of his claim was an unreasonable application of Strickland.

Petitioner has failed to meet this burden. The trial transcript confirms that the jury heard testimony from Shawn Yao and David Williams, crime lab analysts with the Florida Department of Law Enforcement (FDLE), and Dr. Stewart, a forensic pathologist who performed an autopsy on the victim's body, that the victim was killed by a gunshot to the head, and the bullet recovered from the victim's head was a .25 auto caliber bullet most likely shot from a small handgun (Ex. C at 699–700, 716–17, 720, 722, 733, 748, 750, 770, 774–78).

Ulysses Thomas, Petitioner's cousin, testified that on March 6, 2000, Petitioner asked him if he wanted to "pull a lick," meaning, rob someone (Ex. C at 925, 927, 929–30). Ulysses agreed, and the two of them went to Cash Hall (a dormitory near the campus of Tallahassee Community College) (*id.* at 931). At Cash Hall, they met with Caed Brawner, and Caed led Petitioner and Ulysses to the victim's apartment (*id.* at 932). Ulysses testified that the victim answered the door, and Petitioner or Caed asked him if he had any marijuana (*id.* at 934). The victim responded that he did not have any marijuana (*id.* at 934). Petitioner then pulled a BB gun from the waist of his pants and the three of them walked into the apartment (*id.* at 934–36). Ulysses testified that Petitioner ordered the victim to the floor, and the victim complied (*id.* at 937). Petitioner kneeled over the victim with the BB gun pointed at him, while Ulysses and Caed began searching the apartment for money and drugs (*id.* at 937–39). At one point, the victim tried to look up at Ulysses, but Petitioner tapped him on the head with the BB gun and told him to hold his head down (*id.* at 940–41). Petitioner then told Caed to hold the victim down, and the two of them traded positions (*id.* at 941). Caed was holding a small silver gun in his hand at the time (*id.*). Petitioner went into a room and came out carrying a watch (*id.* at 941–42). Ulysses testified that he and Petitioner told Caed, "[M]an, let's go" (*id.* at 943). Caed said, "I got to kill him because he seen my face" (*id.*). Caed asked Petitioner if he could use his (Petitioner's) gun, and Petitioner responded that his gun was not a real gun (*id.* at 955–56). Ulysses testified that he and Petitioner told Caed, "[Y]ou don't got to kill him because we didn't get nothing, ain't no need to kill him, you don't got to kill him" (*id.* at 943–44). Ulysses testified that he and Petitioner then walked out the door (*id.* at 945). He

testified he did not hear a gunshot, but when he and Petitioner were walking home, Caed caught up with them and said "I had to kill him, I had to do him" (*id.* at 947–48). Caed also told them that he threw the gun in a dumpster (*id.* at 948).

The defense stipulated to admission of the victim's watch (Ex. C at 796–97). Theopholis Brinson, Petitioner's distant cousin, identified the watch as given to him by Petitioner (*id.* at 829–31). Mike Ellis, a special agent supervisor with the FDLE, identified a watch box and paperwork, provided to him by the victim's brother, which bore the same serial number as the watch given to Brinson by Petitioner (*id.* at 795–96).

The jury also heard testimony from Leonard Reeves, a law enforcement officer with the Leon County Sheriff's Office, that he interviewed Petitioner at the Sheriff's Office on March 24, 2000 (Ex. C at 897, 899–900). He testified that Petitioner told him that he and two other people went to the victim's apartment to rob the victim of marijuana (*id.* at 903–06, 908). Petitioner told Officer Reeves that when he and the other two men went inside the victim's apartment, they put the victim on the floor in the living room area (*id.* at 906). Petitioner told Reeves that conversation ensued regarding the location of marijuana and the victim's wallet, and Petitioner went to another area of the apartment to look for both (*id.*). Petitioner stated he went to the bedroom to look for the victim's wallet, and when he found it, he looked in it, but there was no money (*id.* at 906–07). Petitioner stated he gave the wallet to Caed Brawner (*id.* at 907). Petitioner told Officer Reeves that Brawner had a small chrome .25 caliber handgun (*id.*). Petitioner stated Brawner then became more hostile because they had not found marijuana, and Brawner thought the victim was lying about whether he had marijuana or money in the apartment (*id.*) Petitioner told Officer Reeves that after he and Ulysses Thomas left the apartment and walked down the stairwell, he heard a gunshot (*id.* at 909). Petitioner stated that at that time, he and Ulysses were in the parking area "a good distance" away from the apartment (*id.* at 909). Petitioner stated Brawner caught up with him and Ulysses, and Brawner told them that he threw the gun in a trash can (*id.* at 910). Petitioner also admitted that he spoke to Eric Parker (a confidential informant for the Sheriff's Office) about the incident at Cash Hall (*id.*). Five audiotapes of Reeves' interview with Petitioner were admitted into evidence (*id.* at 910–11).

      The audiotape which Petitioner challenges is an audiotape of his conversation with Eric Parker. Kenny Pinkard, a special agent with the FDLE, testified that he instructed Eric Parker to contact Timothy Thomas and attempt to get him to talk about the robbery and murder (Ex. C at 859, 863–64). Pinkard testified that Eric Parker was wired with a wireless transmitter, and he (Pinkard) was able to listen to the conversation between Parker and the subject, who identified himself as Timothy (*id.* at 864–65). Pinkard testified he positioned himself approximately 200–400 yards from Eric Parker when Parker made contact with Timothy (*id.* at 864). Pinkard testified that he listened to the conversation between Parker and Timothy, and the conversation was also recorded (*id.* at 865). Pinkard identified the audiotape of the conversation, and it was admitted at trial (*id.* at 866, 871). Pinkard testified that during the conversation between Eric Parker and Timothy Thomas, Timothy stated that his cousin T (Ulysses), Caed, and he (Timothy) went to the victim's apartment to rob him (*id.* at 867). Timothy stated that he had a BB gun, and Caed had a small semi-automatic (*id.* at 868). Timothy stated that Caed knocked on the victim's door (*id.* at 867–68). Timothy stated that the victim did not have any marijuana and started to turn around to go back into the apartment, and he (Timothy) hit him on the head with the BB gun (*id.* at 868–69). Timothy also stated that Caed shot the victim because the victim could recognize him (*id.* at 869). Pinkard testified that he personally came into contact with Timothy Thomas, who he identified in the courtroom as Petitioner (*id.* at 869–70). Pinkard testified that during a search of a residence shared by Petitioner and Ulysses Thomas, he seized a BB gun, which he identified and the State admitted into evidence (*id.* at 870–71). On cross-examination by Petitioner's counsel, Pinkard admitted that Petitioner told Eric Parker that Caed pulled the trigger, and that he (Petitioner) "ain't going to take nobody's life" (*id.* at 875–76, 879).

      Initially, Pinkard's testimony regarding Petitioner's statements did not constitute hearsay, since admissions of a party opponent qualify as an exception to the hearsay rule. *See* Fla. Stat. § 90.803(18). Additionally, in light of Petitioner's admissions during his post-arrest interview with law enforcement, during which he stated he went to the victim's apartment with Brawner and Ulysses Thomas to rob the victim, the three men ordered the victim to the floor, and he knew that Brawner had a handgun, as well as the testimony from Ulysses Thomas and Theopholis Brinson that Petitioner took the victim's watch and gave it to Brinson, there is no reasonable probability that the

jury would have reached a different verdict on the armed robbery with a firearm count if defense counsel had objected to admission of the CI audiotape or Detective Pinkard's testimony regarding that tape.[5] Additionally, in light of the above-described evidence of Petitioner's participation in the robbery, as well as Petitioner's admission to police that Brawner was carrying a small chrome .25 caliber handgun, that he heard a gunshot after he left the apartment, and that Brawner caught up with him and stated he threw the gun in a trash can, and in light of the trial testimony of Shawn Yao and David Williams, the FDLE crime lab analysts, and Dr. Stewart, the forensic pathologist who performed the autopsy on the victim's body, that the victim was killed by a gunshot to the head, and the bullet recovered from the victim's head was a .25 auto caliber bullet most likely shot from a small automatic handgun, there is no reasonable probability that the jury would have acquitted Petitioner on the homicide count if they had not heard the CI audiotape or Detective Pinkard's testimony regarding the tape.[6] Moreover, the CI audiotape and Pinkard's testimony were favorable to the defense because they permitted defense counsel to present to the jury Petitioner's statement that he was not going to take anyone's life, without defense counsel losing the tactical advantage of first and last closing argument, which defense counsel clearly stated during a sidebar conference was an extremely important tactical advantage to the defense (*see id.* at 889–94). Therefore, the state court's denial of Petitioner's claim of ineffective assistance of counsel based upon counsel's failure to object to admission of the CI audiotape or Pinkard's testimony regarding it was not an unreasonable application of <u>Strickland</u>.

---

[5] In Florida, to prove Petitioner's guilt of the crime of robbery with a firearm based upon a principal theory of liability, the State must prove the following elements: (1) Petitioner and Brawner went to the victim's apartment together with the intent of committing a robbery, (2) Petitioner took a watch from the victim's person or custody, (3) force, violence, assault, or putting in fear was used in the course of the taking, (4) the watch was of some value, (5) the taking was with the intent to permanently or temporarily deprive the victim of his right to the watch or any benefit from it, and (6) Petitioner knew that Brawner carried a firearm during the course of committing the robbery. *See* Fla. Stat. §§ 777.011, 812.13(2)(b). "Custody" is defined as "'care, supervision, and control exerted by one in charge.'" <u>Gaiter v. State</u>, 824 So. 2d 956, 957 (Fla. 3d DCA 2002); *see also* <u>Cash v. State</u>, 875 So. 2d 829, 831–32 & n.2 (Fla. 2d DCA 2004).

[6] In Florida, to prove Petitioner's guilt of the crime of manslaughter, the State must prove the following elements: (1) the victim is dead, and (2) Petitioner either (a) intentionally caused the death, or (b) Petitioner intentionally procured the death, or (c) the death was caused by Petitioner's culpable negligence, that is, conduct showing reckless disregard of human life. *See* Fla. Stat. § 782.07.

C.     Ground Five:  "Deprivation of Rights as Secured by the Sixth and Fourteenth Amendments to the United States Constitution Through Denial of a Fair Trial and Procedural Due Process."[7]

Petitioner contends the trial court erred in giving the jury instruction on principal liability, with regard to the armed robbery with a firearm count, because the indictment failed to place him on notice that the State intended to proceed on a principal theory of liability (Doc. 1 at 19). Petitioner states his defense relied solely on the indictment, and if the indictment had adequately notified him that the State intended to proceed on a principal theory of liability, he could have prepared a defense based upon that theory (*id.*). Petitioner argues that the instruction on principals clearly influenced the verdict, as evidenced by the fact that the jury submitted a question during deliberations concerning the principal instruction as it applied to the armed robbery with a firearm count (*id.* at 20). Petitioner contends the trial court's error in giving the instruction violated his due process rights and constituted fundamental error (*id.* at 19–20). Petitioner contends he raised this claim as Ground Four in his second Rule 3.850 motion, but the state courts denied relief (*id.* at 20–21).

Respondent concedes Petitioner exhausted this claim of trial court error in the state courts (Doc. 13 at 13).

1.     Clearly Established Supreme Court Law

An error in instructing the jury cannot constitute a basis for federal habeas relief unless the error "so infected the entire trial that the resulting conviction violates due process." Henderson v. Kibbe, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); *see also* Estelle v. McGuire, 502 U.S. 62, 72, 112 S. Ct. 475, 482, 116 L. Ed. 2d 385 (1991) (a defendant's right to due process is not violated unless an erroneous instruction, when viewed in light of the entire trial, was so misleading as to make the trial unfair).

2.     Federal Review of State Court Decision

The record confirms that Petitioner raised this claim as Ground Four in his second Rule 3.850 motion (Ex. Q at 19–21). The state court found that the State was not required to plead the principal theory in the charging document (*id.* at 44). The court further found that defense counsel

---

[7] The undersigned has reordered Petitioner's claims for organizational purposes.

was not surprised and was fully prepared on the principal theory of liability (*id.*). Additionally, the court found that there was no possible confusion as to whether Petitioner was charged as a principal or with being an accessory before or after the fact, because none of the evidence raised a mere "accessory" situation with regard to the armed robbery, and the overwhelming evidence was that Petitioner planned the robbery, arrived at the scene with two co-defendants, used a BB gun to force the victim on the ground, actually robbed the victim, saw a co-defendant with a gun during the robbery, and was barely out the door when the co-defendant fired the gun and killed the victim (*id.*). Therefore, the state court determined, Petitioner's claim of trial court error in giving the principal instruction was without merit (*id.*).

Upon review of the record, the undersigned concludes Petitioner has failed to show that the court's giving the instruction on principal liability was erroneous. The indictment charged one defendant, Petitioner, as follows:

> The Grand Jurors of the State of Florida, empaneled and sworn to inquire and true presentment make in and for the County of Leon, upon their oaths, do present that
>
> Timothy P. Thomas
>
> on the 6th day of March, 2000, in the County of Leon and State of Florida, did unlawfully kill a human being, Jonathan Enrile, by shooting him with a pistol firearm, and the killing was perpetrated from or with a premeditated design or intent to effect the death of Jonathan Enrile, contrary to Section 782.04(1), Florida Statutes.
>
> COUNT II: And the Grand Jurors of the State of Florida aforesaid, further indictment makes that Timothy P. Thomas on the 6th day of March, 2000, in the County of Leon and State of Florida, did unlawfully take cannabis, watch, or other property from the person or custody of Jonathan Enrile, and in the course of the taking used force, violence, assault, or putting in fear, and in the course of committing the robbery carried a firearm, contrary to Section 812.13(2)(a), Florida Statutes.

(Ex. B at 19). Petitioner does not allege that the indictment failed to sufficiently charge him with the substantive crimes of first degree murder or armed robbery with a firearm; rather, he contends it failed to sufficiently charge him as a principal in the armed robbery with a firearm. However, in Florida, charging an individual with a substantive crime incorporates the commission of the crime as a principal. *See* <u>State v. Roby</u>, 246 So. 2d 566 (Fla. 1971) ("Under our statute [Florida Statutes

§ 777.011], therefore, a person is a principal in the first degree whether he actually commits the crime or merely, aids, abets or procures its commission, and it is immaterial whether the indictment or information alleges that the defendant committed the crime or was merely aiding or abetting in its commission, so long as the proof establishes that he was guilty of one of the acts denounced by the statute."); Hough v. State, 448 So. 2d 628 (Fla. 5th DCA 1984). Because Roby was the law in Florida when Petitioner was tried, the trial court did not err in instructing the jury on the principal theory.

Additionally, Petitioner does not allege that the jury instruction on principals was a misstatement of Florida law. The court's instructions to the jury included the following:

> Principals. If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if, one, the defendant had a conscious intent that the criminal act be done.

> And, two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime. To be a principal, the defendant does not have to be present when the crime is committed or attempted.

(Ex. C at 1141, 1147). This was a correct statement of the law. *See* The Florida Bar 2007 Florida Standard Jury Instructions in Criminal Cases, Fifth Edition, Part One: General Instructions, Chapter 3.5(a) Principals (2007) (instruction adopted in 1987 and amended in July 1990, July 1992, and December 1995). Therefore, Petitioner has failed to demonstrate that the state court's denial of his due process claim was contrary to or an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts. *See* Mitchell v. Esparza, 540 U.S. 12, 14, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (Ohio court's ruling that a defendant need not be identified in an indictment as a "principal offender" unless more than one defendant is named in the indictment, was not contrary to clearly established federal law).

D.　　Ground Three: "Deprivation of Rights as Secured by the Sixth and Fourteenth Amendments to the United States Constitution Through Ineffective Assistance of Trial Counsel and Through Procedural Due Process."

Petitioner contends his trial counsel provided ineffective assistance by failing to object to the jury instructions regarding robbery with a firearm and principal liability (Doc. 1 at 13, 14–16).

He contends the instructions allowed the jury to convict him of robbery with a firearm even though one of the essential elements was not proven, that is, the firearm element, because the evidence showed he actually possessed a BB gun, which is not a firearm (*id.* at 14–15). Petitioner contends he was prejudiced by counsel's failure to object to the firearm and principal instructions because the instructions confused the jury and led them to erroneously convict him of armed robbery with a firearm, even though the evidence showed that he actually possessed only a BB gun (*id.*). Petitioner contends he raised this claim as Ground Two in his second Rule 3.850 motion, but the state courts denied relief(*id.* at 13, 14–16).

Respondent concedes Petitioner exhausted his ineffective assistance of counsel claim in the state courts (Doc. 13 at 20).

1.      Clearly Established Supreme Court Law

The Supreme Court standard for analyzing claims of ineffective assistance of counsel is set forth *supra*.

2.      Federal Review of State Court Decision

The record shows that Petitioner raised this claim as Ground Three in his second Rule 3.850 motion (Ex. Q at 13–16). The state court found as fact that the jury was plainly instructed that a BB gun is not a firearm (*id.* at 43). The court additionally found that the jury was given the standard instruction on principals and instructed that Petitioner could be convicted as a principal on the armed robbery with a firearm count based only on the firearm used by Caed Brawner (*id.*). Based upon these findings, the court determined that Petitioner's claim that defense counsel should have objected to the jury instruction on principals because the evidence showed he never actually possessed a firearm was without merit (*id.*).

Under Florida law, it is generally error to instruct the jury on principals where there is no evidence to support an aiding and abetting theory of guilt. *See* Alvarez v. State, 15 So. 3d 738, 748 (Fla. 4th DCA 2009); McGriff v. State, 12 So. 3d 894, 895 (Fla. 1st DCA 2009); Masaka v. State, 4 So. 3d 1274, 1284 (Fla. 2d DCA 2009); Thomas v. State, 617 So. 2d 1128, 1128 (Fla. 3d DCA 1993). A conviction for aiding and abetting requires the State to prove (1) the defendant's intent that the crime be committed; and (2) the defendant's performance of some act to assist in the commission of the crime. *See* § 777.011, Fla. Stat. (1995); Staten v. State, 519 So. 2d 622, 624 (Fla. 1988). In

this case, there was a sufficient evidentiary basis under Florida law for an instruction on principals. The evidence showed that Petitioner planned with Ulysses Thomas and Caed Brawner to rob the victim; Petitioner arrived at the victim's apartment with Thomas and Brawner; Petitioner hit the victim with a BB gun; Petitioner and his co-defendants forced the victim to the floor; Petitioner actually committed a robbery by taking a watch from the custody of the victim; Petitioner saw Brawner with a .25 caliber handgun during the robbery; and Brawner killed the victim with the gun shortly after Petitioner left the apartment. This was sufficient evidence to support an instruction on principals. *Compare* Alvarez, 15 So. 3d at 748 (trial court did not abuse its discretion in giving principals instruction where male victim had fought with others, including defendant's brother Junior, before his murder; defendant procured the murder weapon from third party accompanied by three other people and in the presence of a fourth; defendant did not have gasoline, though gasoline was used as an accelerant in the arson; defendant's original written confession implied that he had taken male and female victims to an isolated area where someone was waiting; forensic evidence did not exclude others' involvement; and two other people knew about the murders before they were public), *and* Lewis v. State, 693 So. 2d 1055, 1057–58 (Fla. 4th DCA 1997) (use of instruction on law of principals in prosecution for throwing a deadly missile at a building was not abuse of discretion; state advanced dual theories of case, asserting that defendant personally threw firebomb and that if he did not, he was sufficiently involved in crime to be found guilty as aider and abettor, and state's "unknown accomplice" theory was made plausible by evidence that defendant had said beforehand he was going to throw firebomb and said afterward that he had done it, and firebombing took place), *with* McGriff, 12 So. 3d at 895–96 (trial court abused its discretion in instructing the jury on the law of principals, where there was no evidence offered that defendant worked in conjunction with anyone else to commit the crimes, such a theory was never argued before the jury, and the instruction on principals was neither requested by the State nor read in the original reading of the jury instructions). Furthermore, the jury was properly instructed that a BB gun is not a firearm (Ex. C at 1147). Therefore, Petitioner has failed to show a reasonable probability that the trial court would have properly sustained an objection to the principal instruction regarding the armed robbery with a firearm count if defense counsel had raised an objection. He has thus failed

to show that the state court's denial of his claim was contrary to or an unreasonable application of Strickland, or that it was based upon an unreasonable determination of the facts.

    E.    <u>Ground Four: "Deprivation of Rights as Secured by the Sixth and Fourteenth Amendments to the United States Constitution Through Ineffective Assistance of Trial Counsel, and Through Procedural Due Process."</u>

Petitioner contends his trial counsel provided ineffective assistance by failing to move for a new trial on the ground that the jury's verdict on the armed robbery with a firearm count was inconsistent with the evidence (Doc. 1 at 13, 17–18). Petitioner states the verdict clearly shows that the jury found him guilty of robbery with a firearm (Ex. B at 271), and the evidence clearly demonstrated that he was the perpetrator of the robbery, but the evidence was also undisputed that he carried only a BB gun, which is not a firearm (Doc. 1 at 17). Further, the evidence clearly showed that Caed Brawner, who allegedly carried a firearm, did not actually perpetrate the robbery (*id.*). Petitioner contends that counsel's failure to move for a new trial on the ground that the verdict on the armed robbery count was inconsistent with the evidence prevented him from seeking appellate review of the "inconsistent verdict" (*id.* at 17–18). Petitioner contends he raised this claim as Ground Three in his second Rule 3.850 motion, but the state courts denied relief (*id.* at 13, 18).

Respondent concedes Petitioner exhausted this claim of ineffective assistance of counsel in the state courts (Doc. 13 at 22–23).

    1.    Clearly Established Supreme Court Law

The Supreme Court standard for analyzing claims of ineffective assistance of counsel is set forth *supra*.

    2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Three in his second Rule 3.850 motion (Ex. Q at 17–18). The state court found as fact that Petitioner was found guilty of armed robbery with a firearm only as a principal (*id.* at 43). The court additionally determined that a motion for new trial on the grounds asserted by Petitioner would have been properly denied; therefore, defense counsel was not ineffective for failing to make such a motion (*id.*).

Claims of insufficiency of the evidence to support a verdict are governed by the standard set forth by the Supreme Court in <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560

(1979). In <u>Jackson</u>, the Supreme Court held that the Fourteenth Amendment Due Process Clause mandates that no person shall be convicted unless the evidence is sufficient to convince the trier of fact beyond a reasonable doubt of the existence of every element of the offense. *Id.*, 443 U.S. at 316. Thus, the relevant question on review of a sufficiency of the evidence claim is whether "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.

In the instant case, based upon the trial evidence described *supra*, any rational trier of fact could have found the essential elements of the crime of robbery with a firearm, based upon a principal theory of liability, beyond a reasonable doubt: (1) Petitioner and Caed Brawner went to the victim's apartment together with the intent of committing a robbery, (2) Petitioner took a watch from the victim's custody, (3) force, violence, assault, or putting in fear was used in the course of the taking, (4) the watch was of some value, (5) the taking was with the intent to permanently or temporarily deprive the victim of his right to the watch or any benefit from it, and (6) Petitioner knew that Caed Brawner carried a firearm during the course of committing the robbery. *See* Fla. Stat. §§ 777.011, 812.13(2)(b). Therefore, there is no reasonable probability that a motion for new trial on the armed robbery with a firearm count would have been granted on the ground that the verdict was inconsistent with the evidence. The state court's denial of Petitioner's ineffective assistance of counsel claim was, therefore, not contrary to or an unreasonable application of <u>Strickland</u>, nor was it based upon an unreasonable determination of the facts.

 F. <u>Ground Six: "Deprivation of Rights as Secured by the Sixth and Fourteenth Amendments of the United States Constitution Through Ineffective Assistance of Trial Counsel, and Through Procedural Due Process."</u>

Petitioner contends his trial counsel provided ineffective assistance by failing to examine redacted audiotapes of Petitioner's interview with law enforcement and object to admission of the tapes on the ground that the tapes were inaccurate and an untrustworthy representation of Petitioner's actual statements (Doc. 1 at 22–23). Petitioner contends that at the very least, counsel should have demanded that the original tapes be admitted with the redacted version (*id.* at 23). Petitioner argues that if counsel had objected to admission of the tapes on the ground that they were inaccurate, the objection would have been sustained, and the tapes excluded from evidence (*id.* at

22). Petitioner asserts he raised this claim as Ground Five in his second Rule 3.850 motion, but the state courts denied relief (*id.* at 22–24).

Respondent concedes Petitioner exhausted this claim of ineffective assistance of counsel in the state courts (Doc. 13 at 28).

1.      Clearly Established Supreme Court Law

The Supreme Court standard for analyzing claims of ineffective assistance of counsel is set forth *supra*.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Five in his second Rule 3.850 motion (Ex. Q at 22–25). The state court found as fact that the redaction was simply a redaction of statements referring to Petitioner's prior marijuana use (*id.* at 44). The court determined that Mike Ellis and Leonard Reeves sufficiently authenticated the audiotapes (*id.*). The court further determined that the original tapes were preserved for appellate purposes, and the redacted tapes were submitted to the jury (*id.*). The court concluded that Petitioner failed to show that defense counsel performed deficiently by failing to object to the authenticity of the tapes or failing to examine the redacted tapes (*id.* at 44–45). The trial transcript shows that Special Agent Mike Ellis testified that he participated in an interview of Petitioner by law enforcement officials (Ex. C at 798, 807–08). Ellis testified that the interview was recorded, and he identified five audiotapes (State's Exhibit 11) as the recording of the interview (*id.* at 808). During a sidebar conference, the trial judge asked the prosecutor how he intended to present the content of the tapes to the jury (*id.* at 812). The prosecutor stated that the tapes were 3–4 hours in length, and he did not intend to play them during trial (*id.* at 812–13). He stated he intended to question Ellis about Petitioner's statements during the interview, and he intended to admit the tapes into evidence, so they would be available to the jury if they wished to listen to them (*id.*). The prosecutor also stated that a transcript of the tapes was created (and Mike Ellis testified to that), but he did intend to admit the transcript into evidence because it was not redacted to eliminate references to Petitioner's uncharged criminal activities (which included purchase, possession, and use of illegal drugs) and statements of law enforcement officers to Petitioner regarding their opinions as to his credibility, for example, "You're a liar" or "I don't believe you" (*id.* at 814–15). Defense counsel commented that it would not be proper to

admit the transcript as evidence unless the tapes were played during trial, since the tapes were the best evidence, and the transcript was simply an aid to the tapes (*id.* at 813–14). Although defense counsel objected to admission of the tapes, the grounds for the objection were only those grounds asserted in the pre-trial motion to suppress (the statements were the product of an illegal arrest), which had been denied at a pre-trial hearing (*see* Ex. B at 34–51, 65–162; Ex. C at 799–801, 911). Following the sidebar conference, Sergeant Leonard Reeves testified that he was also present during the interview (*id.* at 899). Reeves testified that the interview was recorded, and a transcript of the recording was created (*id.* at 902–03). Reeves testified that he listened to the tapes and reviewed the transcript a few days prior to trial, and the tapes and transcript were accurate representations of what was said by the individuals who participated in the interview (*id.* at 903). Reeves identified the five cassette tapes (State's Exhibit 11) as the audiotapes of the interview, and the tapes were admitted into evidence (*id.* at 910–11).

Petitioner has failed to present clear and convincing to rebut the state court's factual finding as to the content of the redacted statements. Furthermore, although Petitioner describes the redacted tapes as inaccurate and untrustworthy, he has not presented any evidence that the content of the redacted statements was anything more than what was identified by the prosecutor, that is, statements referring to Petitioner's uncharged criminal activities involving drugs and statements of law enforcement officers commenting on Petitioner's credibility. Evidence of Petitioner's uncharged criminal activities and police officers' negative opinions as to Petitioner's credibility would certainly have been damaging to the defense. Therefore, defense counsel's failure to object to the redacted versions of the tapes was by no means unreasonable. Additionally, the authenticity of the tapes was established by Sergeant Reeves; therefore, there is no reasonable probability that an objection on grounds of authenticity would have been sustained. Therefore, the state court's conclusion that Petitioner failed to show that defense counsel's performance was deficient was not contrary to or an unreasonable application of <u>Strickland</u>.

G.    <u>Ground Seven: "Deprivation of Rights as Secured by the Sixth and Fourteenth Amendments to the United States Constitution Through Ineffective Assistance of Trial Counsel, and Through Procedural Due Process."</u>

Petitioner contends his trial counsel provided ineffective assistance by failing to move for a mistrial when the jury breached the trial judge's instructions not to discuss the case among themselves (Doc. 1 at 25–26). Petitioner states during voir dire, Ms. Ambrose, a prospective juror, informed the court and counsel that prospective jurors had breached the court's order by discussing the case (*id.* at 25). Petitioner states that although the court and counsel questioned Ms. Ambrose as to whether she could be impartial in light of her exposure to some details about the case, they did not question any of the other jurors to ascertain how much information had been discussed and the effects of such discussions on their opinions as to Petitioner's participation in the crimes or his guilt (*id.* at 25–26). Petitioner contends he was prejudiced by counsel's failure to move for a mistrial because it prohibited him from ascertaining details about the jurors's discussions and caused him to be tried by a jury who had pre-conceived notions about his guilt (*id.* at 25). He further contends that a motion for mistrial would have been granted because of the uncertainty as to whether the jurors could be fair and impartial (*id.* at 26). Petitioner asserts he raised this claim as Ground Six in his second Rule 3.850 motion, but the state courts denied relief (*id.* at 26).

Respondent concedes Petitioner exhausted this claim of ineffective assistance of counsel in the state courts (Doc. 13 at 30).

### 1.     Clearly Established Supreme Court Law

The Supreme Court standard for analyzing claims of ineffective assistance of counsel is set forth *supra*.

### 2.     Federal Review of State Court Decision

Petitioner raised this claim as Ground Six in his second Rule 3.850 motion (Ex. Q at 26–27). The state court found as fact that the incident to which Petitioner referred concerned questioning on voir dire of *prospective* juror Ambrose, which was prior to any jury selection (*id.* at 45) (emphasis in original). The court additionally found that prospective juror Ambrose, who was later selected to serve on the jury, made it "perfectly clear" that no significant details of the case were mentioned by prospective jurors, and no mention of the case suggested Petitioner's guilt or referenced any fact that was inadmissible or prejudicial (*id.*). The court found that other jurors, for example, prospective juror Harrison, repeated the same type of "generic" exposure, and nothing improper was done or said by the prospective jurors (*id.*). The court additionally found that Petitioner made no allegation that

any of the jurors who were actually selected to serve were unfairly biased or exposed to improper information about the case (*id.*). Further, the jurors were selected while the defense had one or two peremptory challenges left (*id.*). The court additionally found that Petitioner was specifically advised prior to jury selection that the selection of jurors involved strategy in which he had a right to participate, and he agreed to the strategy of selecting his jurors (*id.* at 45–46). The court found that jury selection was a thorough and careful process, as evidenced by the fact that it occurred over a period of two full days and involved four volumes (totaling 616 pages) of transcript (*id.* at 45). The court concluded that juror Ambrose made no statements that raised a ground for mistrial; and any motion for mistrial would have been properly denied by the court (*id.* at 46).

Petitioner has failed to present clear and convincing evidence to rebut the state court's factual findings; therefore, those findings are presumed correct. Furthermore, the court's findings are well supported by the record. The jury selection process lasted two days. After general questioning of one group of prospective jurors, the trial judge announced that there were some individuals who would be questioned privately (Ex. C at 66). The judge announced that the prospective jurors who would not be privately questioned would be permitted to go to lunch, and the others would wait outside the courtroom (*id.*). The judge told the prospective jurors that it was very important not to discuss the questioning or the case with each other or anyone else during the break (*id.* at 67–68). The judge stated that the reason for this was that she and the attorneys wanted the prospective jurors' answers to questions to be accurate and unaffected by anything that occurred during a break (*id.*). After private questioning of several prospective jurors, a group of prospective jurors was again assembled and questioned. After this group was questioned, the trial judge excused the prospective jurors to take another break while the lawyers considered strikes (*id.* at 350). The court reminded the prospective jurors not to talk about the case or the questioning with each other or anyone else (*id.*).

After the prospective jurors left the courtroom, the judge advised Petitioner of the following:

> THE COURT: Just on the record briefly, we are all considering strikes, and I want to get on the record that, Mr. Thomas, you're by law allowed to fully participate in the selection or rejection of jury members and this time, at this time, would be afforded to you [sic] to consult with your attorneys to do that. Do you understand?

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you understand their advice about a juror is simply their advice. It's your trial. If you feel strongly about a strategy, you need to speak up so that they can honor your wishes as to strategy. Do you understand that?

THE DEFENDANT: Yes, ma'am.

(*id.* at 351).

Eleven jurors were tentatively selected, and the others were excused (Ex. C at 356). Seven more prospective jurors were called to the courtroom for voir dire, one of whom was Ms. Ambrose (*id.* at 357–60). The judge summarized the charges and asked the seven prospective jurors whether anyone had "read, heard, or seen anything" about the case (*id.* at 365–66). Several prospective jurors indicated that they had heard something, so the court announced that each of them would be individually questioned about his or her knowledge (*id.* at 366). The record shows that each of those jurors was individually questioned, including Ms. Ambrose (*id.* at 369–97). Ms. Ambrose stated that she had "just peripherally" heard about the incident at Cash Hall (*id.* at 392). She stated she heard that a student had been killed, and the killing may have been drug related (*id.* at 392, 394). When asked how she heard it, she stated she heard it on television, and "a couple of folks out here, as we've been sitting out here, they made some references to it" (*id.* at 392–93). Ms. Ambrose stated that the previous day (the first day of jury selection) was a "long day," and "people are chatting" (*id.* at 393). The judge asked if they were talking about any details of the case, and Ambrose responded, "No, no, just that they had heard about, you know, heard about the case" (*id.*). The judge then asked if Ambrose had recently read, seen, or heard anything purportedly about the facts of the case, and Ambrose responded, "No. No. No, I live in a media vacuum." (*id.*). The prosecutor questioned Ms. Ambrose as to whether she had formed an opinion regarding Petitioner's guilt or innocence, and Ambrose said, "No, no." (*id.* at 395). Defense counsel questioned Ms. Ambrose as to the specific information that she learned from the other prospective jurors, and she responded that she heard from other jurors that the incident occurred at Cash Hall and that it might have been drug related (*id.* at 396–98).

During individual questioning of another prospective juror, Mr. Harrison, Harrison stated that he learned from other prospective jurors that one of the charges was first degree murder, and

the crime occurred at Cash Hall (*id.* at 518–22). When asked whether the information caused him to form an opinion about Petitioner's guilt or innocence, Mr. Harrison responded, "No." (*id.* at 521).

The facts which prospective jurors Ambrose and Harrison mentioned they had heard from others were general facts about the crimes which the court had included in its summary of the case to the jury (Ex. C at 13). None of those facts were inadmissible, prejudicial to Petitioner, or otherwise improper; and none of the facts suggested Petitioner's guilt. Furthermore, each of the jurors who mentioned he or she had heard general facts about the case was questioned about whether the information caused him or her to form an opinion about Petitioner's guilt or innocence, and each responded in the negative. Moreover, Petitioner has failed to show that any of the jurors who were actually selected to serve on his jury were exposed to improper information about the case, were unfairly biased, or had a preconceived notion as to his guilt. Therefore, he has failed to show that defense counsel had a meritorious basis for moving for a mistrial based upon juror bias, or that there is a reasonable probability the trial court would have properly granted a motion if defense counsel had made one. *See* <u>Irvin v. Dowd</u>, 366 U.S. 717, 727, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (to find the existence of actual prejudice, two basic prerequisites must be satisfied: (1) it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty; and (2) it must be determined that these jurors could not have laid aside these performed opinions and "render[ed] a verdict based on the evidence presented in court."); <u>Murphy v. Florida</u>, 421 U.S. 794, 800–01, 804, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975) (defendant failed to show that jury selection process permitted "inference of actual prejudice" where some jurors expressed vague recollection of alleged crime, but voir dire did not indicate that jurors were prejudiced against defendant); <u>Marsden v. Moore</u>, 847 F.2d 1536, 1543–44 (11th Cir. 1988) (defendant failed to show that jury which convicted him was actually prejudiced against him where voir dire did not indicate a hostility to defendant by the jurors that would suggest an impartiality that could not be set aside; thirty-two of forty prospective jurors stated they had heard or read something about the case and sixteen had read the previous day's newspaper article about it, but only four of them stated that they had formed some type of an opinion on the case; of those four, one stated that he could put his opinion aside because "he [knew] how those articles [were]," and another stated that he would not be swayed because the media only presented one side of the

case; the one prospective juror who indicated that his previous opinion would affect him was challenged for cause and did not become a member of the jury). Therefore, Petitioner has failed to demonstrate that the state court's denial of his ineffective assistance of counsel claim was contrary to or an unreasonable application of Strickland.

IV.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 30th day of July 2010.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**